**IN THE COURT OF APPEALS OF IOWA**

No. 21-0959
Filed August 3, 2022

**IN THE MATTER OF THE ESTATE OF SAM VERNON ELSEN, Deceased.**

**MICHELLE LYNN DAVILA,**
    Plaintiff,

**and**

**CHAD MICHAEL ELSEN,**
    Plaintiff-Appellant,

**vs.**

**EMILY JEAN ELSEN-COX,**
**Individually and as Trustee of the SAM VERNON ELSEN REVOCABLE TRUST**
**and Executor of the ESTATE OF SAM VERNON ELSEN,**
    Defendant-Appellee
_____

        Appeal from the Iowa District Court for Pocahontas County, Christopher C.

Polking, Judge.

        Chad Michael Elsen appeals the order denying and dismissing his petition

in an action to contest his father's will and trust.  **AFFIRMED.**


        Scott Bixenman of Murphy, Collins, Bixenman & McGill, PLC, Le Mars, for

plaintiff.

        Scott M. Wadding of Sease & Wadding, Des Moines, for appellant.

        Stephen F. Avery of Cornwall, Avery, Bjornstad & Scott, Spencer, for

appellee.

        Heard by May, P.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Chad Michael Elsen appeals the order denying and dismissing his petition contesting his father's will and trust. He contends the district court erred by finding he failed to prove that Emily Jean Elsen-Cox exercised undue influence over their father in the execution of his will and trust and tortiously interfered with his inheritance.

Because Chad failed to show the will and trust stem from Emily's undue influence or other legal wrong, we affirm.

### I. Background Facts and Proceedings.

Sam Vernon Elsen was born in 1946, the seventh generation in a family of farmers. He was the father of three children, all with his first wife, Marjorie. Sam adopted Michelle, Marjorie's daughter from a prior relationship, shortly after he and Marjorie married in 1973.[1] Emily was born about two years later, and Chad was born two years after Emily.

After Michelle graduated high school and left home in 1984,[2] Sam and Marjorie divorced. Emily and Chad had almost no contact with Sam for about a year. But eventually, regular visits began, and each lived with Sam for a time.

Chad began helping Sam around the farm during his weekend and summer visits, gaining more responsibilities over time. After graduating high school in 1995, Chad worked on Sam's farm under a sharecropping arrangement. In the

---

[1] Michelle was about six years old at the time.

[2] Sam's relationship with Michelle soured during her senior year, and it appears they had little to no contact after her graduation. Although Michelle was a co-plaintiff in Chad's action to contest Sam's will, she did not appeal. As a result, we limit our discussion to the relationships Sam had with Chad and Emily.

years that followed, Sam employed Chad as a salaried employee, paying him $10 per hour on a fulltime basis.

Emily also worked on the family farm over the years, helping with the books and other tasks. She also earned $10 per hour, but she was not employed fulltime like Chad.

Chad has a long history of substance use. He began using alcohol during high school. He started using marijuana when he was eighteen and methamphetamine when he was nineteen. Eventually, Chad began manufacturing methamphetamine on a family-owned acreage, where he lived. This led to his 2003 arrest for manufacturing methamphetamine. Chad pled guilty, went through substance-abuse treatment, and completed his probation. He remained sober for about three years but admits he "started dabbling a little bit" in 2006 or 2007. Chad was indicted on federal charges for being a felon in possession of a firearm in 2007 and tested positive for methamphetamine during pretrial release. He was sentenced to five years of probation, which involved regular drug testing.

Chad stopped farming after his 2003 arrest. He returned to farming in 2007. In 2012, Sam gave Chad a raise to $15 per hour. But Sam was suspicious that Chad and his wife, who were living in Sam's home, were using methamphetamine again. So, when Chad and his wife attended a farm show on August 30, Sam called law enforcement about his concerns. Officers came to Sam's home and found suspicious items in Chad's room that were positive for methamphetamine in field testing. When Chad returned home that night, there were containers of alcohol in his vehicle and he appeared intoxicated. But Chad refused to provide a urine sample for testing despite a search warrant authorizing it. Chad was arrested

and spent almost two weeks in jail. During that time, the State collected hair samples from Chad's head and body; the head hair tested positive for methamphetamine while the body hair tested negative. The State ultimately dismissed all but one of the criminal charges against Chad after laboratory testing of the items recovered from Chad's room was negative for methamphetamine. Chad pled guilty to the remaining charge of possession of drug paraphernalia.

While Chad was in jail, Sam made a new will and trust using a "do-it-yourself" kit. In his will, Sam left all "tangible personal property" to Emily, who he nominated as executor of his estate. The will states, "I intentionally leave nothing to my children Michelle Lynn Davila and Chad Michael Elsen." Sam left the residue of his estate to the Sam Vernon Elsen Revocable Trust. The trust agreement lists Sam as both settlor and trustee with Emily and her daughter listed as successor trustees if Sam was legally found to be incompetent. On Sam's death, the trust was to pay Sam's debts and taxes with the residue distributed to Emily. The trust document also states, "I, Sam Vernon Elsen, intentionally leave nothing to my child Michelle Lynn Davila and my child Chad Michael Elsen." Sam took the will and trust documents to his attorney and signed them with the attorney and his legal assistant acting as witnesses.

Even after Chad's release from jail, Sam remained convinced that Chad was using methamphetamine. He fired Chad and kicked him out of his home. Sam also hired a decontamination service to remove any traces of methamphetamine from his home, an expensive process that required replacing all carpet and drapes and took several months to complete. While work was done on his house, Sam stayed with Emily and her husband.

Sam's relationship with Chad never recovered after the 2012 arrest. In 2013, Sam and Marjorie sought to have Chad involuntarily committed for substance abuse and Chad was convicted of assaulting Sam.[3] Sam confided to his lifelong friend, Dennis Buenting, that he feared Chad. Chad was also convicted of harassing Sam in 2014 and 2015, and the court issued orders preventing Chad from contacting Sam.

Over the years, Sam's cognitive abilities declined. When that decline began and how much it affected Sam is in dispute. Emily reported concerns about dementia to Lisa Leppert, the Advanced Registered Nurse Practitioner who served as Sam's medical provider, in 2011. Leppert prescribed medication to slow the process in November 2012. It was around this time that Sam decided to retire from farming, and he leased his land and farm equipment to Buenting before planting began in 2013. He moved into an assisted-living facility sometime between 2015 and 2017.

Sam died in November 2018. At the time of his death, the gross value of his estate was almost $3 million.

After probate proceedings began, Chad and Michelle filed this action to contest the will and trust. They challenged the validity of the will and trust, alleging

---

[3] Sam described the March 2013 event where Chad pushed his way into Sam's home and threatened him:

> [Chad] was in a rage and told me he was going to mangle & bloody my face in. He said he was going to kill me & my blood would be splattered all over the walls. He started spinning a pool stick & dropped it. It broke into pieces & he was threatening me with it. He kicked all my pop in a rage & was egging me on to fight him. He got on the stairs so he was higher than me & put his face an inch from mine. He knocked off my glasses twice. I feared for my life.

(1) Sam lacked testamentary capacity to execute the will and trust, (2) Emily exercised undue influence over Sam, and (3) Emily had a confidential relationship with Sam. They also alleged that Emily tortiously interfered with an inheritance. The district court granted summary judgment for Emily on the confidential-relationship claim. The court denied the remaining claims and dismissed the petition following a bench trial. Chad appeals.

**II. Discussion.**

This action involves claims of undue influence and tortious interference with an inheritance. We note the substantial overlap between these causes of action:

> To prevail either on an undue influence claim or a tortious-interference claim where the plaintiff is challenging conduct leading to a new will, the plaintiff must prove an outsider overcame the testator's independent will. If the will reflects the true wishes of the testator, then no claim should lie, either for undue influence or tortious interference. In short, the two claims involve "'a substantial overlap' of proofs and witnesses" because a central issue is common to both claims.

*Youngblut v. Youngblut*, 945 N.W.2d 25, 36–37 (Iowa 2020) (internal citations omitted). We address Chad's arguments on each claim in turn.

**A. Undue influence in creation of the will.**

We begin with Chad's contention that the district court erred by rejecting his claim that Emily exercised undue influence over Sam in the execution of his will. Iowa Code section 633.33 (2018) states: "Actions to set aside or contest wills . . . shall be triable in probate as law actions, and all other matters triable in probate shall be tried by the probate court as a proceeding in equity." We review Chad's claim that Sam's will stemmed from undue influence for the correction of errors at law. *See Wolf v. Wolf*, 690 N.W.2d 887, 892 (Iowa 2005) ("In a law action tried to

the court, our review is for the correction of errors at law . . . .").  We are bound by the district court's findings of fact if they are supported by substantial evidence.  *See id.*  "Evidence is substantial if reasonable minds would accept it as adequate to reach a conclusion."  *Id.* (citation omitted).

Undue influence is "equivalent to moral coercion."  *In re Est. of Bayer*, 574 N.W.2d 667, 671 (Iowa 1998) (citation omitted).  To set aside Sam's will on this ground, Chad must prove: (1) Sam "was susceptible to undue influence"; (2) Emily "had an opportunity to exercise undue influence and effect the wrongful purpose"; (3) Emily "had a disposition to influence unduly to procure an improper favor"; and (4) "the result, reflected in the will, was clearly the effect of undue influence."  *Id.*

Chad bears the burden of proving the elements of undue influence by a preponderance of the evidence.  *See Burkhalter v. Burkhalter*, 841 N.W.2d 93, 105 (Iowa 2013).  But the fourth element, causation, requires clear proof.  *See id.* (declining to abandon the requirement that causation be "clearly" shown).

> [I]t is not always easy to distinguish ordinary permissible influences on a testator from improper coercion.  The injection of the word "clearly" into the fourth element of undue influence is designed to add a measure of protection to the free will of a testator, filter out claims that are unduly speculative, and to prevent the doctrine from expanding beyond its limited scope.  All of the other elements of undue influence might be present—susceptibility, opportunity, and disposition—and, still, the will provisions might be the result of the testator's free will.

*Id.* at 105–06.  This heightened requirement for showing causation "ensures the other factors really mattered to the end result."  *Id.* at 106.  Although direct proof of undue influence is not required, *Bayer*, 574 N.W.2d at 671, circumstantial evidence that raises only a possibility of influence is insufficient, *see Burkhalter*, 841 N.W.2d at 106.

In analyzing the undue-influence claim, the court found sufficient evidence that Emily had a chance to unduly influence Sam, as well as "some indications that Emily would be inclined to exert some influence." But it determined that "Sam was not very susceptible to undue influence, physically or mentally," based on the same findings it made in denying a separate claim that Sam lacked testamentary capacity to execute a valid will.[4] On that basis, the court found Chad failed to show Sam executed the will as a clear result of Emily's efforts.

Chad argues the court erred by concluding there is insufficient evidence of Sam's susceptibility to undue influence or that the will was the clear result of Emily's undue influence. But, adhering to our standard of review, we agree that Chad failed to show more than a possibility of undue influence based on speculation and conjecture.

First, the district court made clear credibility findings on the witnesses, to which we defer. *See Neimann v. Butterfield*, 551 N.W.2d 652, 654 (Iowa Ct. App. 1996) (stating that we accord deference to the trial court's superior ability to assess credibility because it observes demeanor and appearance firsthand). It found Chad lacked credibility:

> His animosity towards many of the other witnesses in the case was apparent on many occasions. He had great difficulty remembering dates. When things happened is significant in a will contest and undue influence case because what was operative at the moment the will was signed is very important. Chad would often make damaging concession[s] in his testimony, and then attempt to back track. He acknowledges large amounts of substance abuse and mental health issues such as depression have negatively affected his memory, and that there are entire time periods in which he

---

[4] Chad does not contest the denial of his claim Sam lacked testamentary capacity on appeal.

remembers little clearly, if at all. Some of his explanations regarding matters in the case bordered on incomprehensible.

The court also found that Emily was not so credible as a witness:

> She was evasive and very argumentative in her testimony. Her denial of having made statements regarding concerns for the forgetfulness on the part of Sam at the medical visits with Leppert border on the absolutely incredible. Her explanation of the financing of the purchase of her current home certainly raised suspicions.

And the court found both were susceptible to bias as interested parties.

But ultimately, the court found greater evidence to corroborate Emily's testimony than Chad's. We agree. The testimony of neutral witnesses shows Sam was both physically and mentally capable when he executed his will. The county sheriff testified he had known Sam "for quite some time" and spent three hours at Sam's residence during the August 2012 search. According to the sheriff, Sam "knew what was going on and was real responsive to things" and appeared astute and strong willed. The legal assistant who witnessed the will and trust in September 2012 testified that Sam came to the office alone that day and she never saw a change in Sam's mental abilities from 2002 to 2014. The funeral home director who met with Sam in January 2016 to pre-arrange his funeral services testified she did not think Sam appeared confused or lost. And, most significantly, his nurse practitioner testified that she believed Sam was competent to execute his will in September 2012.[5] The evidence shows Sam engaged in the farming

---

[5] Leppert testified that she met with Sam the day after he signed his will and opined that he was competent at that time:
> Q. Okay. With regard to particularly September 6, because that's the day after the will that is at issue here is dated. On that date are you comfortable that Sam was alert to whom his—who his family was? A. Yes.

operation through the 2012 season, acted as executor of his father's estate from 2012 to 2015, and was the bookkeeper for a rural fire department through 2013. The evidence also shows that Sam had disdain for alcohol and drug use, and his belief in Chad's ongoing use led him to disinherit Chad. Although Chad believes Emily convinced Sam that Chad was manufacturing and using methamphetamine in his home to scare Sam, no evidence supports the claim.

Because substantial evidence supports the finding that Chad failed his burden of proving Emily unduly influenced Sam's will, we affirm.

---

Q. And are you comfortable that he was alert to what property he had? A. Yes.

Q. And if he'd gone into Gordon Madson's office the day before and signed a will, are you comfortable he would have known he was signing a will? A. Yes.

Q. Did you have any concern on September 6 that Sam Elsen was sort of whacked out and didn't have any idea what's going on? A. No. He was—so he was in a lot of stress, too. You know, so I think that played some into some of the issues that he was having. And sometimes with stress people have a little bit of trouble making decisions, forgetting things, you know. I feel like he was pretty stressed at that time.

Q. And did he identify to you what the stress was? A. It was with Chad and the drug use.

. . . .

Q. So I guess in summary, your opinion is as the medical provider here that Sam was competent to write a will? A. I believe he was.

Q. And as far as you didn't see any signs that he was subject to influence or being told what to do? A. No.

Q. Overall in your assessment, did Sam seem pretty independent? A. Yes.

Q. And— A. He was still driving. He was still farming, you know, and even like the managing of finances, I think—I can't say like he couldn't totally do that. I think it was a thing of sort of an overseer of finances, and just helping him.

**B. Undue influence in creation of the trust.**

We turn then to Chad's claim of undue influence in the creation of Sam's trust. Chad distinguishes this claim from his claim of undue influence in execution of the will because he argues a different burden of proof applies. His argument is based on Sam giving Emily power of attorney in 2007, which created a confidential relationship between them. *See, e.g.*, *Cich v. McLeish*, No. 18-0069, 2019 WL 1056804, at *2 (Iowa Ct. App. Mar. 6, 2019) (finding fact that son had his mother's power of attorney created a confidential relationship, generating a presumption that an inter vivos sale of property that benefited the son was fraudulent as a result of undue influence). Chad argues the court should have presumed undue influence, which is the burden of proof applied to inter vivos transfers between a benefactor and beneficiary in a confidential relationship. *See In re Est. of Todd*, 585 N.W.2d 273, 277 (Iowa 1998). In such cases, the burden shifts to the benefitted party to prove by clear, satisfactory, and convincing evidence that the transfer was free from undue influence. *Id.* Chad also asserts our review of this claim is de novo because the trust created an inter vivos transfer.

The district court granted summary judgment for Emily on Chad's confidential-relationship claim. The court noted that Chad conceded confidential-relationship claims apply only to inter vivos transfers and

> offered no arguments of law as to why this count should survive summary judgment. As this matter contests only a will and trust that involved no inter vivos transfers to other persons from Sam Elsen, the court finds that there is no state of facts in front of the court under which a claim of a confidential relationship could survive.

After the trial, the court considered and rejected the undue-influence claim under a preponderance-of-the-evidence burden. Chad argues the court applied the

wrong burden of proof and should have shifted the burden of proving the creation of the inter vivos trust was free from undue inference to Emily.

Chad failed to preserve error on this claim. As the district court found, Chad offered no legal argument in resisting summary judgment. *See Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 539 (Iowa 2022) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court."). Left with the same evidence analyzed above, using the same burden of proof, and applying the same standard of review, we reach the same conclusion: substantial evidence supports the finding that Emily did not affect the creation of the trust through undue influence.

**C. Tortious Interference.**

Finally, we turn to Chad's claim of tortious interference with an inheritance. Chad concedes that we review these claims for correction of errors at law.[6] *See Burkhalter*, 841 N.W.2d at 94 (involving a claim of tortious interference with a revocable trust tried at law).

To succeed on his tortious-interference claim, Chad had to show he "had a reasonable expectation of receiving an inheritance"; Emily "committed an intentional and independent legal wrong"; her purpose was to interfere with Chad's expectancy; her conduct caused the expectancy to fail; and Chad suffered

---

[6] Chad argues that we must apply a de novo standard, claiming the action was tried in probate and the claims were not bifurcated. *See In re Est. of Kline*, No. 18-1658, 2019 WL 6358421, at *3 (Iowa Ct. App. Nov. 27, 2019) (reviewing claim of tortious-interference claim de novo because it was tried in probate with undue-influence claim involving an inter vivos transfer without bifurcation or either party seeking an at-law determination). But, as stated above, this action was properly docketed and tried in the district court as a law action.

economic loss as a result. *Buboltz v. Birusingh*, 962 N.W.2d 747, 753 (Iowa 2021) (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 19, at 160–61 (Am. L. Inst. 2020)), *reh'g denied* (Aug. 25, 2021). Chad contends the court erred by finding he failed to show Emily committed an independent legal wrong that caused his expectancy to fail.

In rejecting the tortious-interference claim, the district court relied on its finding that Emily did not unduly influence Sam's will or trust. The court noted that Chad never identified another "legal wrong" on which to base this claim. On appeal, Chad again cites Emily's undue influence as the legal wrong. We agree Chad has not proved any undue influence by Emily for the reasons already stated. Thus, his tortious-interference claim also fails.

**AFFIRMED.**